UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

PRINCE TOBURAS JERMAINE ROLLE,
     Petitioner,

v.                          Case No. 6:21-cv-475-GAP-GJK

UNITED STATES OF AMERICA,
     Respondent.

**UNITED STATES' RESPONSE IN OPPOSITION TO ROLLE'S
MOTION TO VACATE, SET ASIDE, OR
CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

The United States opposes for the following reasons Prince Toburas Jermaine Rolle's

motion to vacate, set aside, or correct his sentence. Civ. Doc. 1.[1]

## I.   STATEMENT OF THE CASE AND FACTS

### A.   Criminal Conduct Committed by Rolle on September 27, 2017

On January 13, 2017, the defendant began serving a term of supervised release

following his release from imprisonment for two federal drug crime convictions. *See* Doc.

152 at 3 (103). Then, in September 2017, while on supervised release, he committed new

crimes that not only constituted violations of the terms of his release, but resulted in new

federal drug crime convictions:

On September 27, 2017, an OPD TAC Unit officer saw a male individual, later

identified as Prince Toburas Jermaine Rolle ("Rolle"), driving a light-blue Hyundai Sonata,

---

[1] References to filings in criminal case number 6:17-cr-301-GAP-GJK are cited as "Doc. [document number] (301)." References to filings in criminal case number 6:09-cr-103-GAP-GJK as "Doc. [document number] (103)." References to filings in this civil case are cited as "Civ. Doc. [document number]."

commit several traffic infractions. Doc. 160 at 150–51, 154 (301); Doc. 162 at 84 (301). The officer followed the Sonata and requested assistance from another TAC Unit Officer. Doc. 160 at 153 (301). A nearby TAC Unit responded, pulled up behind the Sonata, and deployed "StarChase," an onboard GPS tracking system.[2] Doc. 160 at 153–55 (301); Doc. 162 at 38, 162 (301). Instead of pulling over, the Sonata sped away, but was tracked to an apartment complex in Maitland. Doc. 162 at 40, 86–87, 91–92 (301); *see also* Doc. 160 at 154–58, 160–61 (301).

While following Rolle to the apartment complex, an officer saw a black bag fly out of the Sonata's passenger-side window and land on the side of the road. Doc. 160 at 161 (301). Officers later recovered the backpack, which contained a loaded .45-caliber semiautomatic pistol, an electronic scale, a spoon, a baggie containing 47 grams of fentanyl, and a baggie containing 166 grams of the synthetic stimulant Molly. *Id.* at 169–71, 184–85 (301); Doc. 162 at 106–08 (301).

After arriving at the apartment complex, Rolle parked the Sonata, took off running, and a chase ensued. Doc. 160 at 164–65 (301). As Rolle ran away, he discarded a black cellphone onto the grass. *Id.* 160 at 165–66 (301). Officers lost sight of Rolle, set up a perimeter and went door-to-door looking for Rolle. *Id.* at 167–68, 173–74 (301). In the Sonata, an officer found a rental agreement in Rolle's name, obtained his personal identification information and photo, and immediately recognized Rolle as the driver of the Sonata. *Id.* at 151–52, 173–76 (301). After unsuccessfully locating Rolle, officers left the complex. *Id.* at 179 (301).

---

[2]An officer deploys the StarChase system by pulling up behind a vehicle and shooting darts from the patrol car's front that adhere to the back of the other vehicle. Doc. 162 at 85 (301). The darts connect to a satellite and enable officers to follow the vehicle via GPS. Doc. 162 at 85 (301).

A few hours later, Rolle reported the Sonata stolen from a different location, and an Orange County Sheriff's Deputy responded to the call. Doc. 162 at 138–39 (301). When the deputy arrived at the reported location, Rolle and a woman were standing outside. *Id.* at 139 (301). Rolle described the stolen car as a rented, light-blue Hyundai Sonata. *Id.* at 139–40 (301). He said that he had gone to his cousin's house to play cards, noticed that the keys to the car were missing, and then discovered that the car was gone. *Id.* at 140–41 (301).

Cell-tower location information for a phone number that Rolle regularly used, however, showed that his phone was not in the vicinity of his cousin's house at the time of the alleged theft, but rather was in the vicinity of the foot chase through the apartment complex. *Id.* at 228–34 (301).

On October 19, 2017, Rolle was arrested on a charge that he had violated the conditions of his release by committing the new criminal conduct detailed above.  Doc. 101 (103).  Then, on December 20, 2017, a federal grand jury in the Middle District of Florida returned an indictment charging Rolle with possession of fentanyl with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count One), and possession of a firearm and ammunition after having been convicted of crimes punishable by imprisonment for more than one year, in violation of 18 U.S.C. § 922(g)(1) (Count Two). Doc. 1 (301).

**B.    The Proceedings on the Supervised Release Violation, on Rolle's New Charges, and on Rolle's Attorney's Criminal Charge**

Rolle's initial appearance on the supervised release violation occurred on October 31, 2017, with the Federal Public Defender representing him. *See* Doc. 102 (103). A few days later, though, Dickerson, whom Rolle had retained, entered an appearance on Rolle's behalf. Doc. 107 (103).

Dickerson also appeared on Rolle's behalf and entered a not-guilty plea for him at his December 22, 2017, initial appearance on the new federal criminal charges. Doc. 151 at 2, 5 (301). On that same day, a magistrate judge entered an order scheduling Rolle's trial for the trial term beginning February 5, 2018. Doc. 10 at 7 (301).

Dickerson had been arrested herself a month earlier, on October 7, 2017, because of an altercation with Orlando TAC Unit officers Stanley Avignon and Landon Thomas during a traffic stop. Civ. Doc. 1-1 at 2–4. On November 2, 2017, the State of Florida charged Dickerson by complaint with resisting an officer without violence. *Id.* at 5.

Meanwhile, Rolle's new case proceeded toward trial. At a January 5, 2018, status conference, Dickerson moved to continue the trial until March 2018. Doc. 142 at 5 (301). The Court granted the motion and scheduled the next status conference for February. Doc. 142 at 5 (301).

That status conference occurred on February 13, 2018, but Dickerson did not appear. *See* Doc. 156 at 2 (301). The Court conducted the brief conference in her absence, stating that the case would be tried sometime in March. Doc. 156 at 2 (301). A week later, the Court set Rolle's trial for March 26, 2018. Doc. 17 (301).

On March 8 and 9, 2018, Dickerson was tried and convicted in an Orange County, Florida court on her resisting-an-officer charge. Civ. Doc. 1-1 at 6–7. Officers Avignon and Thomas testified at that trial. *See id.* The court sentenced Dickerson to serve ten days in Orange County Jail, but the court suspended her sentence on the condition that she serve 100 hours of community service. *Id.* at 8–10.

The Court conducted the next status conference in Rolle's case on March 13, 2018. *See* Doc. 145 (301). At the status conference, Dickerson again moved to the trial until April,

stating that she anticipated that Rolle would be changing his plea. Doc. 145 at 2 (301). The Court agreed to move the trial to April 23, 2018, but warned Dickerson that, if Rolle had not changed his plea by seven days before that date, the court would not accept a plea agreement and Rolle would have to plead "straight up" if he did not want to go to trial. Doc. 145 at 2 (301).

On April 9, 2018, the Court scheduled a change-of-plea hearing for Rolle for April 13. Doc. 25 (301). But, on April 12, the Court cancelled that hearing because Rolle decided to proceed to trial. Doc. 27 (301).

On April 23, 2018, the parties appeared for trial. *See* Doc. 147 (301). Dickerson, however, told the court that the United States had given her undisclosed discovery and that she had not had sufficient time to subpoena witnesses who might be able to present exculpatory evidence relating to that discovery. *Id.* at 5–6 (301). Apologizing to the court for the late notice, she requested that the Court continue the trial for at least another week to give her an opportunity to subpoena witnesses. *Id.* at 6–7 (301). One of the items that she had just received was a report showing that a latent fingerprint found on the cellphone that Rolle had thrown down at the time of the offense did not belong to Rolle, and she requested an opportunity to determine whose fingerprint that was. *Id.* at 9–10 (301). She argued that that information might be "extremely exculpatory for Mr. Rolle." *Id.* at 9 (301). She also explained the additional preparation she needed to do with respect to the other items that the United States had recently disclosed. *Id.* at 9–17 (301).

The Court ruled that the case was not ready for trial, stating, "notwithstanding who is to blame for it, we're not ready for trial with all this new information having been disclosed one or two business days ago, so I have no option but to grant defendant's

5

motion." *Id.* at 19 (301). Dickerson asked for a continuance until the end of May, the Court asked Rolle if he agreed with that request, and Rolle said that he did. *Id.* at 19–20 (301). The Court, therefore, continued the trial until May 29, 2018. Doc. 37 (301).

Rolle's trial began as scheduled on May 29, 2018, and proceeded with Dickerson exercising all of her peremptory challenges, presenting an opening statement raising a defense of mis-identification, asserting appropriate objections, conducting voir dire as to certain witnesses and evidence, cross-examining witnesses as to their ability to identify Rolle as the person who had committed the charged crimes, moving for a judgment of acquittal, presenting a closing argument, and doing all of the things that lawyers ordinarily and appropriately do at trial. *See* Docs. 53, 55, 57 (301). Although Dickerson was 12 minutes late to court on the morning of the second day of the trial, she apologized and explained to the court that she had been delayed by traffic and weather in dropping off her children at school, which had caused her to be late to court. Doc. 55 at 6, 235–36 (301).

Ultimately, the jury was unable to reach a verdict, so the Court declared a mistrial. Doc. 57 at 6–7 (301). The Court suggested retrying the case in July, but Dickerson asked the court to schedule the trial sooner, given that Rolle was incarcerated. *Id.* at 7 (301). The Court set the new trial for June 19, 2018. *See* Doc. 52 (301).

On June 18, 2018, Dickerson filed Rolle's witness list, naming 26 potential witnesses. Doc. 60 (301). Most of the witnesses were law-enforcement officers from the TAC Unit who were named on the computer-aided dispatch report and who had responded to the chase through the apartment complex. *See* Doc. 60 (301); Doc. 81 at 7 (301). That list included Officers Avignon and Thomas—the two officers who had conducted Dickerson's traffic stop the previous October and who had testified during Dickerson's court case the previous

March. *See* Doc. 60 (301); Civ. Doc. 1-1 at 3–4, 6–7. It also included their supervisor,

Sergeant Wesley Whited, who had been advised of the incident. *See id.*

When the second trial convened on the morning of June 19, 2018, the United States

complained that Rolle's identification of so many police officers as potential witnesses was

taking many officers out of duty for the duration of the trial. Doc. 81 at 6 (301). Dickerson

assured the court that she had contacted the officers to tell them when they might be called

as witnesses, and she explained her basis for naming them as witnesses—several of them

had been involved in the lock-down of the apartment complex. *Id.* at 7 (301). The Court

ruled that it would be an abuse of process for Dickerson to subpoena every officer named on

the dispatch report. *Id.* at 8 (301). Later that day, Dickerson told the court that she had

spoken with and excused many of the listed officers. *Id.* at 98–99 (301).

As the trial continued, Dickerson proceeded largely as she had done during the first

trial, presenting an opening statement, asserting appropriate objections, conducting voir dire

of witnesses at appropriate times, and cross-examining the witnesses regarding their ability

to identify Rolle, investigators' failure to connect a fingerprint on the cellphone to

Dickerson, and other things. *See* Docs. 81, 83, 85 (301). Dickerson also called several

witnesses to testify, including Rolle's fiancée Alexandra Charles, who testified that Rolle

had told her that day that he thought his rental car had been stolen.[3] Doc. 83 at 250–57

(301).

The jury retired to deliberate on the third day of the trial but was unable to reach a

verdict that day. Doc. 85 at 53, 55 (301). It resumed deliberating the next day. *See* Doc. 87

(301). The jury continued to deliberate that morning but again was unable to reach a

---

[3] Charles provided similar testimony at the first trial. *See* Doc. 55 at 171 (301).

verdict. Doc. 87 at 10 (301). Consequently, the Court declared a mistrial a second time. Doc. 87 at 10–11 (301).

The Court conducted the next status conference in Rolle's case on August 14, and Dickerson was not there when court convened. Doc. 158 at 2 (301). Another attorney who was present in the courtroom stepped in on Rolle's behalf to discuss setting the date for the third trial. *Id.* at 2–3 (301). The court decided, however, to call Dickerson to determine why she was not there. *Id.* at 4 (301).

When the Court reached Dickerson by phone, she apologized for her failure to appear, saying: "I thought this case was just reset for trial. I honestly did not see that it was set for a status, so I sincerely apologize." Doc. 158 at 4–5 (301). The Court set the trial for September 4. Doc. *Id.* at 5–6 (301).

Rolle's third trial began as scheduled on September 4, 2018. Doc. 160 (301). The United States again voiced its concern that Rolle's witness list identified many law enforcement officers who could not provide any relevant testimony. *Id.* at 4–5 (301). The United States also alerted the Court that Dickerson had included Rolle's fiancée Alexandra Charles on the list even though she was under investigation for perjury based on her testimony at the second trial. *Id.* at 5 (301).

The Court noted that Dickerson had arrived late that morning and warned her that the Court would not overlook her tardiness in the future. *Id.* at 5 (301). In response to the United States' argument about Rolle's witness list, the court stated: "I don't understand subpoenaing all these police officers you're not going to call. Unless you've got a good explanation, I'm going to have to start imposing sanctions." *Id.* at 5 (301). Dickerson insisted, however, that all of the listed officers had information that was relevant to the case

as they had all responded to the September 27, 2017 incident and had participated in locking down the apartment complex. *Id.* at 5–6 (301). She assured the court that she had communicated with all the officers and had told them that she would notify them if they would be needed to testify and that she had already released some of them. *Id.* at 6 (301). The Court ruled that Charles could testify and that the Court would address any objections regarding Charles's testimony at the appropriate time. *Id.* at 8 (301).

The Court then proceeded with voir dire for the third trial, during which Dickerson exercised appropriate challenges to members of the venire. *Id.* at 10, 77–78, 83, 119–20, 122–25 (301). For the third time, Dickerson gave an opening statement, raising a mis-identification defense. *Id.* at 141–45 (301). And the trial proceeded much as the first two had. *Id.* at 145–204 (301).

On the second morning of the trial, the Court convened at 8:30 a.m., and Dickerson arrived one minute late at 8:31 a.m., explaining that she had had a "small issue" with her staff the previous day and was "running alone" that day. Doc. 162 at 4 (301). The Court fined her $100 for her tardiness. Doc. 110 (301); Doc. 162 at 4 (301).

The Court then addressed the "issue" regarding which Dickerson had referred, telling her that, on the previous day, Dickerson's assistant had been using a cellphone in the courtroom to send personal text messages, which violated the Court's standing order. Doc. 162 at 4–5 (301). The Court stated that the assistant had refused to turn over the phone or her identification when asked and had called the security officer a "fucking asshole" when he had stopped her from reentering the courtroom. *Id.* The assistant had been escorted from the courthouse and had been told not to return unless the court ruled otherwise. *Id.* at 5 (301). Dickerson assured the court that she had spoken with that staff member and had

addressed the issue with her and that the staff member would not be returning to court. *Id.* at 5–6 (301). The trial resumed thereafter, with Dickerson raising objections, conducting voir dire of witnesses, and cross-examining the United States' witnesses. Docs. 162, 164 (301).

On the third day of the trial, the Court addressed Rolle directly to ensure that he understood his right to testify in his own behalf. Doc. 164 at 66 (301). When the Court asked Rolle whether he had discussed with Dickerson whether he should testify, Rolle replied, "Yes, sir"; the court then asked Rolle whether he had been satisfied with Dickerson's representation of him in the case. *Id.* at 66 (301). Rolle replied, "Yes, sir." *Id.* at 66 (301). Rolle elected not to testify. *Id.* at 98–99 (301).

After the United States had rested, Dickerson began to call witnesses in Rolle's defense. *Id.* at 67–68 (301). As she had done at the previous trials, she questioned several law-enforcement witnesses, including Officer Avignon, about their inability to identify Rolle. *Id.* at 85–92 (301). She questioned both a deputy and a records custodian from the Orange County Sheriff's Office about the report filed by Rolle that the Sonata had been stolen. *Id.* at 69, 93–97 (301). She questioned the apartment complex's property manager about the manager's statement to investigators that one of the complex's residents matched the description of the person who had been the subject of the chase. *Id.* at 74 (301). And she questioned Rolle's federal probation officer about a cellphone number connected to Rolle. *Id.* at 102–07 (301). She did not call Charles to testify. *Id.* at 98 (301).

The Court then instructed the jury, following which Dickerson and counsel for the United States presented their closing arguments. *Id.* at 111–58 (301).  Dickerson did not

move for a judgment of acquittal. After deliberating for less than two hours, the jury

returned its verdict finding Rolle guilty as charged. *Id.* at 159–60 (301).

### C.     The Post-Trial Proceedings

The next day, September 7, 2018, Judge Antoon transferred the supervised release

case to Judge Presnell so that he could preside over the two related cases. Doc. 125 (103).

On September 10, Judge Presnell entered an order directing Dickerson to appear before the

Court on September 18 to show cause why the Court should not impose sanctions for her

assistant's violation of the court's standing order during Rolle's trial. *See* Civ. Doc. 1-2 at 2–

3. The Court directed Dickerson to bring her employee with her to the hearing. *Id.*

Dickerson failed to appear for the hearing and failed to pay the $100 fine that the

court had imposed for her tardiness to trial. *Id.* at 9–10, 12–16. The Court referred the

matter to the United States Attorney's Office for a criminal contempt investigation. *Id.* at

84–85. That matter, *United States v. Dickerson,* Case No. 6:18-cr-215, Middle District of

Florida, was assigned to District Judge Roy B. Dalton.

On September 21, 2018, the state court in Dickerson's resisting-an-officer case

conducted a hearing and found that Dickerson had failed to complete her 100 hours of

mandatory community service. Civ. Doc. 1-1 at 11. The court ordered Dickerson to serve

eight days in the Orange County Jail; she served that sentence, and she was released from

custody on September 27. *Id.*; *see State v. Dickerson,* Case No. 2017-MM-009328-A-O, in the

County Court of the Ninth Judicial Circuit in and for Orange County, Florida.

On October 2, 2018, Magistrate Judge Kelly conducted a final revocation hearing on

the supervised-release-violation charge, with Dickerson representing Rolle. *See* Doc. 156

(103). At the hearing, the United States informed the magistrate judge that a jury had found

Rolle guilty of the two crimes that were the basis for the supervised-release-violation charge and argued that that disposition constituted *res judicata* in the supervised-release case. Doc. 156 at 3 (103). Dickerson confirmed that she agreed with the *res judicata* dispotition but told the magistrate judge that Rolle (who likely wished to preserve his appellate rights) did not want to plead guilty. Doc. 156 at 4 (103). The magistrate judge agreed to take judicial notice of the verdict. *Id.* The magistrate judge thereafter entered a Report and Recommendation finding that Rolle had violated the conditions of his supervision and recommending that this Court enter an order to show cause why his term of supervised release should not be revoked. Doc. 132 (103). The Court entered that order later that day and scheduled a hearing for December 3, 2018. Doc. 133 (103).

The United States Probation Office prepared Rolle's Initial Presentence Investigation Report on October 29, 2018. *See* Rolle's Initial PSR; Doc. 113 (301). In the Initial PSR, the probation office determined that Rolle had a total guidelines offense level of 32 and a criminal history category of VI, Initial PSR ¶¶ 29, 55, for an advisory range of imprisonment of 210 to 262 months, Initial PSR ¶ 89.[4] On November 21, 2018, Dickerson submitted a variety of factual and legal objections and requested the Court to depart downward from Rolle's advisory guidelines range. *See* Rolle's Final PSR at 36.

Meanwhile, on November 16, 2018, District Judge Dalton conducted a status conference in Dickerson's criminal contempt matter. Civ. Doc. 1-3 at 5. At the hearing, counsel for the United States told the Court that the United States Attorney's Office had

---

[4] Because Rolle had prior convictions for aggravated battery with a deadly weapon and conspiracy to possess five grams or more of cocaine base with intent to distribute it, he qualified as a career offender under USSG §4B1.1. *See* Final PSR ¶ 27. But he had an offense level of 32 and a criminal-history category VI either with or without that enhancement. *See* Final PSR ¶¶ 26, 56.

concluded that it would be unable to show that Dickerson's conduct with respect to the contempt allegations had been willful. *Id.* at 7–8. Regarding Dickerson's failure to appear at the September 18, hearing, the United States explained its position that Dickerson's office had operated in a disorganized fashion and thus the United States could not show that Dickerson's conduct had resulted from a willful violation of a court order rather than from a negligent oversight. *Id.* at 10–11.

Dickerson then addressed the court, explaining that she had not understood that her employee's possession of Dickerson's cellphone within the courtroom would violate the court's standing order with respect to phones. *Id.* at 12–14. Regarding her failure to appear for the September 18 hearing, she explained that, when her office had been served with the order to show cause, a member of her staff had placed it on her desk without opening it. *Id.* at 14. She stated that she had not known that any action was pending against her until a United States Deputy Marshal had served her with the order referring the case to the United States Attorney and setting the criminal contempt proceeding for trial. *Id.* At that point, she and her assistant had found the original unopened envelope under some papers on her desk. *Id.* at 14–15. She stated, "Had I known or had any idea of a court date, I absolutely would have been there." *Id.* at 15.

Dickerson also addressed the $100 fine that the district court had assessed her. *Id.* at 16. She explained that she had received an electronic notification of it during Rolle's trial and had "made a mental note to [her]self to go and check on that," but had neglected to do so. *Id.* at 16–17. She stated that, on September 18 or 19, she had been served with a contempt order because of her failure to pay the fine on time and had gone to the clerk's office to pay the fine with a credit card but had been told that she needed to pay with cash or

a money order. *Id.* She stated that she paid the fine with cash on her next available opportunity, which had been October 1. *Id.*

Clearly perturbed with Dickerson, the court said, "So let me just take this opportunity to tell you, Ms. Dickerson, that it does not sound to me like you're qualified to practice in the United States District Court based on your current level of office organization or professionalism." *Id.* at 18. The court told Dickerson that it would refer the matter to the court's grievance committee to allow the committee members to look into her practice and to recommend whether her Bar privileges should be suspended or revoked. *Id.* at 18–19.

The court also determined that a finding of civil contempt was appropriate and that the court would decide later what would constitute an appropriate fine. *Id.* at 19. The court said, "I'm trying to find out what it would take to get your attention, and I'm concerned that even now the Court does not have your attention." *Id.*

The court further noted that Dickerson had been "cavalier . . . about receiving a fine from the presiding judge," that she had not bothered to open her mail, and that she had not paid a fine until she had gotten around to it. *Id.* The court stated that her conduct had been "stupefying and unacceptable" and that the court was "not going to tolerate it." *Id.* The court stated that it was not going to permit her to practice in that court until the court was convinced that she was going to "up [her] game." *Id.* at 20.

Asked if she had "any thoughts on the subject," Dickerson replied that she would "like to do whatever the Court wanted [her] to do." *Id.* The court asked her if she had done anything to rectify her staffing situation and to try to familiarize herself with the Court's practice rules, and Dickerson replied that she certainly had. *Id.* She explained the new

14

systems that she had put in place at her office to ensure that she did not overlook mail or deadlines, she told the court how she had trained her employees, and she assured the court that she and her staff had reviewed the court's standing orders and local rules. *Id.* at 21.

The court asked Dickerson whether she had any pending matters in that court, and Dickerson said that she had two, including Rolle's upcoming sentencing. *Id.* at 22. The court then dismissed the criminal-contempt proceedings against Dickerson but said that it would be referring the matter to the court's grievance committee and would impose a sanction at a later time. *Id.* at 22–26.

District Judge Presnell conducted Rolle's sentencing hearing and supervised release revocation proceeding three weeks later, on January 7, 2019. *See* Doc. 166 (301). That morning, Dickerson filed four-character letters on Rolle's behalf. Doc. 121 (301). During the hearing, she objected to the paragraphs in the PSR identifying Rolle as the perpetrator of the charged crime and to the suggested upward adjustments, which were based on his filing of a false police report, *see* Final PSR ¶¶ 15, 25, and on his reckless creation of a substantial risk of bodily injury by his flight from law enforcement officers, *see* Final PSR ¶¶ 13, 24; *see also* Doc. 166 at 4 (301).

Noting that the court had tried the case three times and was well aware of the facts, the district court overruled the objections to the description of the offense conduct. Doc. 166 at 6 (301). The court also found that a preponderance of the evidence supported the upward adjustments. *Id.* at 7 (301). The court, therefore, adopted the factual statements in the PSR and determined that the appropriate guidelines level was 32, with a criminal history category of VI. Doc. *Id.* at 7 (301). The court noted that, although Rolle's advisory

guidelines range was 210 to 262 months' imprisonment, the statutory-maximum sentence was 240 months' imprisonment. *Id*. at 7 (301).

Dickerson requested that the court depart downward from the advisory guidelines range based on Rolle's lack of reliance on criminal activity to earn a living. *Id*. at 9 (301). She explained that, after Rolle had been released on bond, he "had taken pretty significant steps to try to turn his life around." *Id*. at 9–10 (301). She noted that his only two other adult convictions happened to qualify him as a career offender. *Id*. at 10 (301). She told the court that, while Rolle had been incarcerated for his 2011 convictions, his mother, stepfather, and grandfather, who were the only people who had been his source of guidance in his life, all had passed away. *Id*. at 10 (301). She described the steps that he had taken since his release to turn his life around. *Id*. at 10–11 (301). And she argued that Rolle had not relied on criminal activity for his livelihood. *Id*. at 10–11 (301). She cited USSG §5H1.9 as a basis for a downward departure from the advisory guidelines range. *Id*. at 11–12 (301).

In response, the United States argued that the evidence had shown that Rolle had indeed depended on criminal activity for his livelihood. *Id*. at 12–13 (301). The district court agreed with the United States, saying: "[T]here's some evidence that Mr. Rolle was engaged in—in some legitimate efforts, but . . . the amount and type of drugs here far outweigh any legitimate effort to support oneself, and there's no evidence supporting that. So I don't believe that that's an appropriate departure." Doc. *Id*. at 13 (301).

After consulting with Rolle about whether he had any other information in mitigation to convey, Dickerson asked the court to sentence Rolle at the bottom of the applicable guidelines range. *Id*. at 13 (301). Rolle then spoke on his own behalf, arguing, among other things, that he did not believe that he qualified as a career offender. *Id*. at 14

(301). He told the court that he wanted Dickerson to challenge that designation. *Id.* at 14 (301). The court explained to Rolle, however, that only his lawyer could assert legal objections to the PSR, that she had already done so, and that the court had overruled those objections. *Id.* at 15–16 (301). The court also noted that, regardless of the career offender enhancement, Rolle's guidelines offense level and criminal history category would be the same. *Id.* at 15 (301).

After the United States had explained its reasons for requesting a sentence within the advisory guidelines range, the district court discussed the 18 U.S.C. § 3553(a) factors and sentenced Rolle at the bottom of the guidelines range to 210 months' imprisonment. *Id.* at 20–22 (301).

The Court then addressed Rolle's violation of the conditions of his supervised release. *Id.* at 23 (301). For the same reasons that she had objected to the PSR, Dickerson objected to the magistrate judge's Report and Recommendation advising the district court to find Rolle guilty of violating the conditions of his supervision.  The district court, however, overruled Dickerson's objections and adopted the Report and Recommendation. *Id.* at 24 (301).

The Court noted that it could impose a sentence of up to three years' imprisonment and that Rolle's advisory guidelines' range was 33 to 36 months' imprisonment. *Id.* at 24–26 (301). Dickerson left the sentence to "the discretion of the Court," but asked the court to "run any term of incarceration concurrently with the terms of incarceration in the most recent case." *Id.* at 25 (301). In response, the United States noted that the guidelines advise the court to run a sentence imposed for a supervised release violation consecutively to any

other term of imprisonment and asked the court to impose a consecutive 33-month term of imprisonment. *Id.* at 25 (301).

The Court stated that it rarely imposed a concurrent sentence for a supervised release violation because that would make the violation "somewhat meaningless." *Id.* at 26 (301). After taking into consideration the "rather substantial sentence" that the court had just imposed, the court imposed an additional consecutive 24-month sentence for the supervised-release violation. *Id.* at 26 (301). Dickerson filed notices of appeal on Rolle's behalf the next day. Doc. 142 (301); Doc. 127 (301).

On February 15, 2019, the Court's grievance committee issued its Report and Recommendation with respect to Dickerson's conduct. Civ. Doc. 1-3 at 28. Because of Dickerson's failure to appear at two status conferences in Rolle's case, her tardiness to trial, her assistant's use of a cellphone in court, her failure to timely pay the $100 fine, her failure to appear at the hearing on the order to show cause, and her deficiencies in various state-court cases, the committee concluded that "serious sanctions" were in order. *Id.* at 34. It recommended that the court refer Dickerson to the Florida Bar, suspend her from the Bar of the Middle District of Florida for 12 months, and prohibit her from taking new cases in the Middle District of Florida until she is reinstated. *Id.* at 37. The committee also recommended that Dickerson comply with numerous conditions before being reinstated. *Id.* at 37–38.

District Judge Dalton directed Dickerson to file a response to the committee's report on or before March 6, but she did not do so. *Id.* at 42. The court, therefore, adopted the Report and Recommendation in its entirety on March 18, 2019 and imposed the sanctions that the committee had recommended. *Id.* at 43–44.

In addition, in April 2019, the Florida Bar filed a complaint against Dickerson based on her unprofessional conduct in Rolle's MDFL case, as well as similar alleged unprofessional conduct (including tardiness) in other cases. *See* Exh. 1.  On March 5, 2020, after reviewing the Florida Bar's complaint, the Florida Supreme Court issued an order suspending Dickerson from the practice of law in Florida for two years. *See* Exh. 2; *see also* Rule Regulating the Florida Bar 3-5.1(h); Exh. 3 (petition for debarment) at 1–2. After Dickerson failed to notify some of her clients of her suspension from the Florida Bar as required by the Supreme Court's suspension order and Florida Bar rules, Dickerson was debarred by the State of Florida on November 16, 2020.[5] See Exhs. 3 (petition for debarment), 4 (debarment order).

Rolle appealed his conviction and was represented by Jenny L. Devine from the Office of the Federal Defender for his appeal. Docs. 127, 133. In his appeal, Rolle challenged whether (1) the totality of circumstances surrounding trial counsel amounted to structural error under *United States v. Cronic*, 466 U.S. 648 (1984), under which a defendant's case must be subjected to "meaningful adversarial testing"; and (2) the district court erred by imposing the 2-level guidelines increase under U.S.S.G. § 3C1.2 for reckless endangerment

---

[5] Dickerson's ultimate debarment, which occurred more than two years after the conclusion of Rolle's third trial, has limited relevance to the specific ineffective performance analysis that this Court must make, which should be focused on the facts of Rolle's case and the alleged prejudice that he suffered.  See *Ruffin v. United States*, 330 F.2d 159 (8th Cir.1964) (no "legal shadow" cast by "abstract fact" of subsequent disbarment); *Curry v. Estelle*, 412 F.Supp. 198 (S.D.Tex. 1975) (attorney had been convicted of felony, on appeal at time of trial; not incompetent), aff'd, 531 F.2d 1260 (5th Cir. 1976) (per curiam) (subsequently disavowed on other grounds); *United States ex rel. Ortiz v. Sielaff*, 404 F.Supp. 268 (N.D.Ill. 1975) ("Ortiz also alleges that Bradley's subsequent disbarment for accepting fees without providing services is relevant to the issue of effective assistance of counsel. Only the circumstances surrounding Bradley's performance at this trial, however, are relevant."), aff'd, 542 F.2d 377 (7th Cir. 1976); *Escobedo v. United States*, 350 F.Supp. 894 (N.D.Ill. 1972) (attorney served with disciplinary petition before trial; conviction affirmed), aff'd, 489 F.2d 758 (7th Cir. 1973) (mem.).

during flight. *See United States v. Rolle*, Nos.19-10105-HH, 19-10122-HH, 2019 WL 5867510; *see also* Exh. 5. On March 19, 2020, the Eleventh Circuit affirmed Rolle's conviction, finding that Dickerson had subjected the government's case to "meaningful adversarial testing," that Rolle had not shown that he suffered prejudice as a result of the alleged ineffective assistance of his trial counsel, and that the § 3C1.2 enhancement was justified. Doc. 171. The Eleventh Circuit agreed with Rolle that, as was undisputed by the United States, Dickerson's conduct during Rolle's trial was "unprofessional." Doc. 171 at 17–18.  But the Eleventh Circuit held that Rolle had failed to prove how this conduct had prejudiced him: "To be sure, Dickerson was sanctioned for her unprofessional conduct in Rolle's trial. But the conduct for which she was sanctioned—arriving late and violating a standing order— has no discernible connection to 'the framework within which the trial proceeds.' Likewise, Rolle fails to explain how Dickerson's own personal criminal or disciplinary matters affected the fairness of his criminal proceedings." Doc. 171 at 17–18; *see also id.* at 11 (showing that the Eleventh Circuit took into account the recent suspension of Dickerson's Florida bar membership in reaching its decision).

Rolle filed the instant section 2255 motion on March 12, 2021. Civ. Doc. 1.  This court has ordered the United States to respond.

## II.    MEMORANDUM OF LAW

Rolle contends that his underlying conviction should be vacated for two reasons. First and foremost, he contends that, pursuant to *United States v. Cronic*, 466 U.S. 648 (1984), he experienced a "complete denial of counsel" and his case was not subjected to any "meaningful adversarial testing," and thus that he is entitled to a *per se* ruling that he suffered prejudice. Civ. Doc. 1 at 21–33. This argument was already assessed and rejected

by the Eleventh Circuit when Rolle appealed his conviction. *See* Doc. 171 at 13 –18 ("Here, Dickerson subjected the government's case to meaningful adversarial testing. She did all the things lawyers normally do at trial.").  This argument is thus procedurally barred, as set forth below. *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000).  Second, Rolle briefly contends that even if Dickerson's misconduct was insufficient under the *Cronic* standard, she nonetheless provided ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (holding that ineffective assistance occurs where "counsel's conduct so undermined the proper functioning of the adversarial process" that the proceedings "cannot be relied on having produced a just result").  *See* Civ. Doc. 1 at 33–35. This claim also fails, as set forth below.

### A.   Burden of proof

In general, on collateral review the petitioner bears the burden of proof and persuasion on each and every aspect of his claim, *Beeman v. United States*, 871 F.3d 1215, 1221–25 (11th Cir. 2017) (collecting cases), which is "a significantly higher hurdle than would exist on direct appeal" under plain error review, *see United States v. Frady*, 456 U.S. 152, 164–66 (1982). Accordingly, if this Court "cannot tell one way or the other" whether the claim is valid, then the petitioner has failed to carry his burden. *Beeman*, 871 F.3d at 1225; *cf. United States v. Rodriguez*, 398 F.3d 1291, 1300 (11th Cir. 2005) (in plain error review, "the burden truly is on the defendant to show that the error actually did make a difference … Where errors could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test, and the burden is on the defendant."). Rolle cannot meet this burden.

**B.      Timeliness**

Rolle's judgment of conviction became final on August 16, 2020, when the time for

seeking certiorari review had expired; therefore, he had until August 16, 2021, to file his

section 2255 motion. *Kaufmann v. United States*, 282 F.3d 1336, 1338 (11th Cir. 2002) (if

prisoner does not petition for certiorari, conviction becomes final upon expiration of ninety-

day period for seeking certiorari). Rolle timely filed his section 2255 motion on March 12,

2021. Civ. Doc. 1

**C.      Cognizability and procedural bars**

Rolle's claims that counsel was ineffective are grounded in the Sixth Amendment

and are cognizable under section 2255. *See, e.g., Lynn v. United States*, 365 F.3d 1225, 1234

n.17 (11th Cir. 2004) (ineffective assistance claims should be decided in section 2255

proceedings).  Under the rule of prior resolution, however, Rolle cannot obtain review of

arguments that were asserted—and resolved—on appeal, which in this case means he

cannot relitigate the Eleventh Circuit's ruling on his *Cronic* claim. "Once a matter has been

decided adversely to a defendant on direct appeal, it cannot be re-litigated in a collateral

attack under section 2255." *See United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000)

(quoting *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977)); *see also Stoufflet v. United States*,

757 F.3d 1236, 1240–42 (11th Cir. 2014) (analyzing prior resolution and contrasting the

law-of-the-case doctrine, which regulates judicial affairs before final judgment); *Olmstead v.*

*United States*, 55 F.3d 316, 319 (7th Cir. 1995) (section 2255 motion is "neither a

recapitulation of nor a substitute" for direct appeal; absent changed circumstances of fact or

law, court will not reconsider an issue already decided on direct appeal). Specifically, Rolle,

relying on *Cronic,* claims counsel failed to subject his case to "meaningful adversarial

testing." *See* Civ. Doc. 1 at 21–33. The Eleventh Circuit considered these exact arguments and rejected them when affirming Rolle's conviction. *See* Doc. 171 at 13–18. Merely recasting the issue as an ineffective assistance of counsel claim does not make it so. *Nyhuis*, 211 F.3d at 1343 (re-characterizing a ground for relief will not avoid procedural bar). In any event, Rolle's *Cronic* claim, as well as his *Strickland* ineffective assistance of counsel claim, fail on the merits.

### D.    Merits

To succeed on an ineffective assistance of counsel claim, a petitioner must meet a stringent, two-prong test. First, the petitioner must show that counsel committed "errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, the petitioner must prove resulting prejudice. *Id*. If the petitioner fails to establish either of the *Strickland* prongs, his claim fails. *See Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1319 (11th Cir. 2005). *Strickland* sets a "high bar" for ineffective assistance claims and surmounting it "is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citation omitted).

When evaluating performance, this Court must apply a "strong presumption" that counsel has "rendered adequate assistance and [has] made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc; quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992)).

To establish deficient performance, a petitioner must show that "no competent counsel would have taken the action that his counsel did take." *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). The standard that the petitioner must meet is both "rigorous" and "highly demanding," and requires a showing of "gross incompetence" on counsel's part. *Kimmelman v. Morrison,* 477 U.S. 365, 381–82 (1986).

A petitioner demonstrates prejudice only when he establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In his motion, Rolle states that Dickerson behaved unprofessionally and unethically and that her professional problems created structural error during a critical stage of his proceedings—his trial. *Id.* at 23, 31. Although Rolle's counsel undoubtedly was unprofessional in some of her interactions with the court, and although the United States does not condone her conduct, no structural error occurred here because she did not entirely fail to subject the prosecution's case against Rolle to meaningful adversarial testing, as the Eleventh Circuit has already held. She developed a defense for him and represented him through the course of three trials, with the first two ending with hung juries and mistrials. Throughout all three trials, she performed the normal functions of an attorney, challenging venire members during voir dire, giving an opening statement that set forth Rolle's defense, cross-examining government witnesses, calling defense witnesses, and presenting a closing argument. Before Rolle's sentencing hearing, she asserted factual and legal objections to the

PSR, and she pursued those objections at the sentencing hearing. Under these circumstances, Rolle could obtain relief from his convictions based on a claim of ineffective assistance of counsel only if he could show both that his counsel's performance was deficient and that her deficient performance prejudiced his defense. He has not done that

Although the United States certainly does not condone much of Dickerson's conduct, most of her deficiencies had nothing to do with her representation of Rolle, and the record simply does not come close to establishing the type of circumstances that would warrant the granting of relief absent a showing of actual prejudice to Rolle.

Indeed, the Eleventh Circuit recently held that "[t]he *Cronic* decision limited the presumption of prejudice to cases where defense counsel '*entirely fails* to subject *the prosecution's case* to meaningful adversarial testing' in the trial or where there is 'the complete denial of counsel' at a "critical stage of [the] trial.'" *United States v. Roy,* 855 F.3d 1133, 1144 (11th Cir. 2017) (en banc) (emphasis this Court's) (quoting *Cronic,* 466 U.S. at 659), *cert. denied,* 138 S. Ct. 1279 (2018). As explained, that is not the situation we find ourselves in here. Dickerson most certainly was present and vigorously contesting the United States' case here. She represented Rolle at three trials and convinced at least some jurors during the first two trials that he was not guilty. Following the second mistrial, she attempted to obtain his release on bond. *See* Doc. 71 (301); Doc. 120 (301). Although the third trial resulted in Rolle's conviction, Dickerson emphatically advocated for him from the beginning of that trial through the end. She exercised a challenge for cause and peremptory challenges during voir dire, Doc. 160 at 122–26 (301); presented an opening statement that laid a foundation for a defense of mistaken identity, Doc. 160 at 141–45 (301); asserted objections and cross-examined witnesses, *see generally* Docs. 160, 162, 164 (301); and called five defense witnesses

to testify (two of whom testified that Rolle had reported his car stolen on the day the car had been involved in the offense conduct), Doc. 164 at 68–99 (301). In her closing argument, she tied together Rolle's mistaken-identity defense and the suggestion that the person who had stolen Rolle's car had been the actual perpetrator of the charged offenses, she noted that Rolle's fingerprints had not been found on any of the evidence recovered, and she offered an explanation for Rolle's cellphone hits on the towers near the apartment complex. *See* Doc. 164 at 135–49 (301).

Then, before Rolle's sentencing hearing, Dickerson asserted factual and legal objections to the PSR, *see* Final PSR Addendum, and she reiterated those objections at the hearing with respect to both the sentencing and the supervised-release violation, *see* Doc. 166 at 4, 24 (301). Therefore, before, during, and after the trial, Dickerson served as Rolle's advocate in the truest sense. Although she undoubtedly acted unprofessionally at times during the case, the *Cronic* presumption-of-prejudice does not apply here. *See Chanthakoummane v. Stephens*, 816 F.3d 62, 73 (5th Cir. 2016) (*Cronic* did not apply when petitioner's two attorneys had conducted through investigation, made informed strategic decisions, and called numerous witnesses).

Although Dickerson did fail to appear for a status conference, appeared late by telephone for a second status conference, and was late to court on both the first and the second days of Rolle's third trial, the court did not convene on any of the trial days until she was present, and she was not absent for any testimony or argument, much less for any critical stage in the proceeding.

An analysis of the case through the more standard *Strickland* lens of ineffective of counsel produces the same result.   To establish ineffective assistance of counsel, Rolle must

demonstrate that his defense counsel's decision was "so patently unreasonable a strategic decision that no competent attorney would have chosen this strategy." *Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001). *See also*, *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'"). Here the record establishes that Dickerson investigated the case, developed a defense for Rolle (that twice succeeded), and advocated for him throughout the proceedings. *See* Doc. 176 at 32–33. Dickerson's defense of Rolle was thus nowhere close to "patently unreasonable." Indeed, Rolle himself indicated during the third trial that he was fully satisfied with her performance. Doc. 164 at 66 (301).

Nor has Rolle carried his burden of showing how he was prejudiced by Dickerson's conduct. Although Rolle argues that Dickerson failed to file any pretrial motions or to call a defense expert witness to address the cell-tower evidence, he has not identified any meritorious motions she could have filed or what an expert witness might have testified. "If there is no bona fide defense to [a] charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic,* 466 U.S. at 656–57 n.19.

Rolle also contends that, because Dickerson included on Rolle's witness list the two TAC Unit officers who testified against Dickerson during her own criminal trial and those officers' supervisor (Sergeant Whited), Dickerson had a "personal conflict of interest" that she should have brought to the court's attention. *See* Doc. 176 at 31. Although a defendant need not show actual prejudice if he shows that an actual conflict of interest adversely affected his lawyer's performance, *see Cuyler v. Sullivan,* 446 U.S. 335, 349–50 (1980), the

Eleventh Circuit has limited the applicability of the presumed-prejudice rule to conflicts of interest arising from concurrent representation of multiple defendants, *see Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d 240, 265 (11th Cir. 2013). Indeed, the Supreme Court explained in *Mickens v. Taylor*, 535 U.S. 162, 174–75 (2002), that, although Courts of Appeals have applied *Cuyler* "unblinkingly to all kinds of alleged attorney ethical conflicts," including "when representation of the defendant somehow implicates counsel's personal or financial interests," the "language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." (internal quotation marks omitted.)

No multiple-defendant-representation issue arose here, and Rolle has not shown that any alleged personal conflict affected Dickerson's performance. Dickerson had already been convicted and sentenced by the time of Rolle's third trial, so Dickerson had no reason to attempt to curry favor with any law-enforcement witness. She ended up calling only one of those witnesses to testify, Officer Avignon, and nothing about her brief questioning of him about his role in assuming a position at the perimeter of the apartment complex suggested that her prior encounter with him was affecting her performance. *See* Doc. 164 at 85–87 (301).

Rolle also contends that Dickerson incorrectly argued at his sentencing for a lower sentence based on an "upward departure" guidelines provision. *See* Doc. 176 at 11. In fact, however, Dickerson requested "a downward departure on the basis of Mr. Rolle's lack of reliance upon criminal activity to make a living," Doc. 166 at 9 (301), and she cited USSG §5H1.9 as a basis for that request, Doc. 166 at 11–12 (301). That section provides a basis for requesting an appropriate sentence, although it is neither an upward nor a downward departure provision. And Dickerson did present Rolle's mitigating circumstances to the

district court in pursuit of a sentence at the bottom of the advisory guidelines range, which she succeeded in obtaining. *See* Doc. 166 at 9–12, 20–21 (301). Rolle simply does not establish how this mistake resulted in actual prejudice to him.

Finally, Rolle cavalierly suggests that Dickerson "appears to have behaved unethically by allowing [Rolle's girlfriend] to commit perjury for a false alibi during the first two trials." Civ. Doc. 1 at 31. Nothing in the record, however, supports the suggestion that Dickerson intentionally suborned perjury. Indeed, after it had become clear that the United States was investigating his girlfriend for having committed perjury, Dickerson refrained from calling her as a witness at Rolle's third trial. *See* Doc. 164 at 98 (301). Contrary to Rolle's argument (Civ. Doc. 1 at 34–35), this was a reasonable decision under the circumstances and was not one that resulted in prejudice to Rolle. In any event, Rolle should not get relief from his conviction premised on his having allowed his girlfriend to present a false alibi at his other two trials.

## E.   Need for an evidentiary hearing

Rolle is not entitled to an evidentiary hearing. To establish entitlement to an evidentiary hearing on a claim of ineffective assistance of counsel, a petitioner must "allege facts that would prove both that his counsel performed deficiently and that he was prejudiced by his counsel's deficient performance." *Hernandez v. United States*, 778 F.3d 1230, 1232–33 (11th Cir. 2015). Rolle has the burden of establishing the need for an evidentiary hearing, *see Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc), and he would be entitled to a hearing only if his allegations, if proved, would establish a right to collateral relief, *see Townsend v. Sain*, 372 U.S. 293, 307 (1963).

This Court may consider the entire record when determining whether to hold an evidentiary hearing. *See Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014). Summary dismissal is warranted when "it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief[.]" *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003) (quoting 28 U.S.C. foll. § 2255). Accordingly, no hearing is required when the record establishes that a section 2255 claim lacks merit, *see United States v. Lagrone*, 727 F.2d 1037, 1038 (11th Cir. 1984), or that it is defaulted, *see McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Similarly, no hearing is required when the petitioner's allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record. *Aron v. United States*, 291 F.3d 708, 714–15 (11th Cir. 2002) (citation omitted).

Rolle has not established the need for an evidentiary hearing because his arguments are facially insufficient to merit relief.

THEREFORE, the United States respectfully requests that this Court deny Rolle's 28 U.S.C. § 2255 motion.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:    */s/ Chauncey A. Bratt*
Chauncey A. Bratt
Assistant United States Attorney
USA No. 174
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: chauncey.bratt@usdoj.gov

**U.S. v. ROLLE**   **Case No. 6:21-cv-475-GAP-GJK**

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Joseph E. Zwick

/s/ Chauncey A. Bratt
Chauncey A. Bratt
Assistant United States Attorney
USA No. 174
400 W. Washington Street, Suite 3100
Orlando, Florida  32801
Telephone:  (407) 648-7500
Facsimile:   (407) 648-7643
E-mail: chauncey.bratt@usdoj.gov